## Beech's Adoption.

*Parent and child — Adoption — Consent of parents — Abandonment by father—Act of April 4, 1925.*

1. The jurisdiction to decree adoption in Pennsylvania is statutory, and is vested by the Act of April 4, 1925, P. L. 127, in the Orphans' Court of each county.

2. Where children, at the death of their mother, are living with their maternal grandparents, who are willing and able to support them, and it appears that the father has abandoned the children and refuses to support them, he will not be heard to object to the adoption of the children by their grandparents, and especially is this the case if the children prefer to remain with their grandparents.

3. "Abandonment" has been defined as "to renounce all care or protection of; totally to withdraw ourselves from an object; to lay aside all care for it; to leave it altogether to itself."

4. Abandonment strips the parent of his natural right to control and guide the child in its welfare.

Petition for adoption. O. C. Allegheny Co., Sept. T., 1925, No. 942.

*Langfitt & Langfitt,* for rule; *J. Leo Collins,* contra.

TRIMBLE, J., Jan. 15, 1926.—The question is whether an adoption of children may be decreed against the protest of a father who has neglected them and refused to provide for them.

Anthony J. Roland and wife are petitioners for the adoption of Margaret M., Mary R. and James Beech, their grandchildren, whose ages are eleven, nine and eight years respectively. These children are the issue of Margaret E. Beech, the daughter of petitioners, who died July 20, 1924, and Edwin C.,

Beech's Adoption.

her husband, who remarried on April 8, 1925. They were all born in the petitioners' home and have lived there the greater part of their lives, but at the time of their mother's death she and her husband had a home separate from the petitioners, where the children lived with their parents a part of the time. It is beyond doubt that the children have always preferred the home of the grandparents.

It is alleged that the father abandoned his children at the time of their mother's death. Notice of the filing of the petition was served on him. He refused to consent to the adoption and denied the allegation of abandonment. Testimony was taken in support of the charge, and it appeared that, immediately after the death of the mother, the children went to live with their grandparents and have lived there ever since. The father promised to obtain a home large enough to accommodate all of the family. He contributed small sums of money for their support, and, being insufficient, in April, 1924, on a charge of non-support lodged against him, he was sentenced to pay $84 each month to the grandparents for the children's support. At this hearing, nine months after his wife's death, it appears that the father for the first time said that he had a home for the children. After the order of court was made, he paid for one month only and has failed to comply further or to give any reason for not doing so. In appearance, he is a strong, able-bodied man, and if his energies were spent in a proper manner he would be abundantly able to have a home for his children and supply it with all their needs. The total amount of his contributions since their mother's death has been only a trifle compared to the actual cost paid by their grandparents.

Although living in East Pittsburgh, a borough of this county adjoining North Braddock, where the petitioners live with the children, their father admitted at the hearing that he had not seen them for five months. He is getting a living for himself and wife in an unlawful business that invites prosecution and imprisonment and creates an environment unfit for children. His present wife charged him with assault and battery, saying in her information that he "did unlawfully, wantonly, wilfully and maliciously assault and beat" her by "striking her several times on the chest and face with his fists and did otherwise abuse her." Her denial of this in court seemed to be coerced. At any rate, when confronted with the information which she admitted on the witness-stand, she swooned and fell head first out of the witness-box to the floor of the court-room.

Some time, about April, 1925, when the proceeding was entered for desertion and non-support, the father of the children consulted his counsel about obtaining their custody by writ of *habeas corpus*. The testimony offered at the hearing in this court was such as to prevent a decree in his favor if he should attempt to gain the custody of the children. He now offers a home for these children, but on account of the behavior of himself and wife, any court would reject his offer and refuse to permit him to exercise the rights of a parent, because in his home the children would see, as they have always seen throughout their lives when living with the father, intemperance accompanied by coarse explosions of drunkenness and have every opportunity for assimilating evils of demoralized examples. He must know that the children are much better cared for by the grandparents than they would be if living with him and his wife; it is his hatred for these grandparents that prevents his consent to an adoption.

The jurisdiction to decree adoption in Pennsylvania is statutory and in the Orphans' Court of each county in Pennsylvania: Act of April 4, 1925, P. L. 127; McQuiston's Adoption, 238 Pa. 304. The act above referred to requires

the consent of natural parents, unless adjudged insane or habitually drunken or there is abandonment by them. The adoption of these children, therefore, depends upon whether their neglect and desertion by their father, his refusal to support them and his demoralized behavior deprive him of his natural rights incident to parentage—whether these omissions constitute abandonment.

In Pennsylvania, from June 11, 1879, until the passage of the Adoption Act of 1925, desertion of children by parents destroyed all their natural rights, because adoption followed as if they were dead: Act of June 11, 1879, § 10, P. L. 142. Section 1 of the Act of May 19, 1887, P. L. 125, authorized adoption when the parents, from drunkenness, profligacy or other cause, neglected or refused to provide for children for a year or upwards and the child's representative gave consent. The Act of 1925 does not affect parental rights until it is found by decree that parents are insane or habitual drunkards or that they have abandoned their children.

In Booth v. Van Allen, 7 Phila. 401, abandonment is defined: "To forsake entirely; to renounce and forsake—to leave with a view never to return." There are other similar definitions, as in 1 Corpus Juris, 3: "To renounce all care or protection of; totally to withdraw ourselves from an object; to lay aside all care for it; to leave it altogether to itself." These definitions do not have sufficient extent of meaning to reach all the conditions in which abandonment may occur, for it is not difficult to see how the submission of children to debauchery, depravity or vice without dissolution of family ties and separation of the parents from them will leave the same or, perhaps, worse effects than forsaking with an intention never to return.

The result of abandonment is a surrender and forfeiture by the parents of a natural but not an absolute right—an admission of emancipation. The State is supreme in its power over parents and children, and by the statute has enacted that abandonment strips the parent of his natural right to control and guide the child in its welfare. To hold this right he must pay the debt he owes to the child. "He that begets thee, owes thee; and has a natural right over thee," said the founder of this Commonwealth in "Some Fruits of Solitude." When the parental obligation is forsaken with an intent never to be paid, all natural rights are renounced and they cannot be reclaimed and restored except the welfare of the child will be promoted by re-establishment of the relation through merit. Exposure of children in the time of Justinian effected emancipation; Roman Private Law, Leage, 1906, page 82; Radin in the Classical Journal, Vol. XX, No. 6, March, 1925; and there can be no lighter penalty imposed for abandonment.

If emancipation is not the result of abandonment, the welfare of children must often be of less concern to the State than the natural rights of unworthy parents. The declaration of the Superior Court in Keeler's Adoption, 52 Pa. Superior Ct. 516, that parents have superior rights to the custody of their children over strangers cannot be held out as an authority to prevent the State, acting through the courts, from decreeing adoption because of abandonment when opposed by a parent who has neglected his duties, because in that case the mother had not done so. Refusal to consent to an adoption might easily create one of the results of abandonment—the necessity for advancing the welfare of the child, or a reckless consent might be the means of subjecting the child to debauchery, depravity or vice. When parents perform their duties to their children, or when they would if they could but are prevented by some misfortune, no court could decree the adoption of their children without the consent, and in some cases would not with the consent, as where mate-

rial prosperity accompanied by dissipating luxuries or excesses would be the only reward. To repeat, parental rights to their children are natural, but not absolute.

The inducement to decrees for all adoptions must be the welfare of the child. The State is always interested and concerned for their cultural development, their religious, moral, physical, intellectual and material uplift, and its power to control these and prevent depravity by adoption cannot be stayed by an arbitrary refusal of consent by a parent who, being able to support his children, has refused to do so and left them to drift.

The children presented for adoption in this case were not permitted to hear the testimony against their father and stepmother. The oldest was examined privately in chambers by me. She is a bright, cheerful little girl, eleven years old, with fine prospects by reason of her intellectuality, and shows the good effects of the motherly care of her grandmother. She was well and appropriately clothed by the grandparents and expressed a decided preference for living with them, and, in my opinion, nothing could be more disastrous to her as she enters and goes through the formative period of her life than the continuous shocks to good morals which would necessarily follow from association with her parent and his wife. The home of the grandparents offered to all the children is better in every respect than the parents'.

A decree will be drawn, based upon the abandonment of the children by their father, and the record will be impounded and kept from the view of the children and all others except by decree of court entered of record.

From William J. Aiken, Pittsburgh, Pa.